HANNAH T. WHITE and others *vs.* HENRY W. HICKS, sur-
viving executor &c. and others.

H. gave to his executors the sum of $100,000, in trust to pay over the income
to his daughter, R., during her life, and in case she should have no children
or grandchildren living at the time of her death, then in trust to pay over
one half of such sum, viz. $50,000, to such person or persons, whether her
husband or otherwise, as she might by last will and testament appoint.
R. made a will by which she gave her husband $50,000, in general terms,
and without any reference to the power of appointment given her by the
will of her father. *Held* that the will was a valid execution of the power.

*Held, also,* that evidence as to the circumstances or condition of the property or
fund in the hands of H.'s executors; to show that R.'s own savings or property
was not sufficient to answer the special legacies bequeathed by her will;
and of other extrinsic facts, as distinguished from what she said, at or
about the time of executing her will, was properly received.

ELIZA H. HICKS RIEBEN, who was the daughter of
Samuel Hicks, deceased, died in the year 1855, leaving
her husband surviving, but no descendants. During her
last *illness*, and shortly before her death, she made a will,
which was duly admitted to probate in 1857. This instru-
ment was drawn by the attending physician, Dr. Cheeseman.
By its provisions she gave to her husband, Pierre Rieben,
$50,000; to Hannah T. White, $20,000; to Samuel Hicks
Seaman, $5000; to Maria W. Corlies, $1000; to Fanny
Haff, $1000; to Luther Terry, $1000. The residuary clause
was in the following terms: "The remainder to be equally
divided between my cousins Elizabeth White, Sarah Hicks
White and Cornelia White. All my clothing, jewelry, books,
papers and personal property contained in the Metropolitan
Hotel, and No. 10 West Fourteenth street, the bureaus,
boxes and trunks to be given unopened to my cousins, Eliz-
abeth White and Sarah Hicks White, for their use and con-
trol; the paintings at No. 10 West Fourteenth street, I give
to my brother Henry W. Hicks; the one at the Metropolitan
Hotel, by J. Terry, to be given to any public institution he
may choose to name." The will further provided that, in

case of the decease of her husband, the $50,000 given to him should go in various sums to John Rieben, Caroline Hicks Seaman, John Hicks, John W. Haydock, Mrs. Chapman and Elizabeth White. If nothing could be heard of her husband, the legacy of $50,000 was to be held in trust for his benefit for ten years by Dr. Cheeseman, Edward H. White and Henry W. Hicks. Pierre Rieben, the husband, was living at the decease of his wife, and is now a lunatic in charge of a committee in Switzerland.

By the will of Samuel Hicks, the father of Mrs. Rieben, proved in 1837, she was entitled to the income of the sum of $100,000, given in trust to the executors of Samuel Hicks, viz. Henry W. Hicks, one of the above named defendants, and John H. Hicks, now deceased; also to the use for life of the premises No. 245 Broadway, and to certain household furniture absolutely. That will also contained the following power of appointment as to the $100,000 in trust to the executors. "But if she has no children or grandchildren living at the time of her death, then in trust to pay over one half thereof, to wit, $50,000, to such person or persons, whether her husband if she be married, or otherwise, as she may by last will and testament appoint; but the other half of said fund, it is my will, shall become part of, and go with the residue of my estate." The residue was given equally to her brothers, John H. Hicks and Henry W. Hicks. This disposition was not accompanied by any express limitation over, in default of an appointment. The daughter was an invalid, before her father's death, and she so continued ever afterwards. Subsequently to her father's death she resided in France, for many years. She married Pierre Rieben December 15, 1847. Her net income was about $12,000 per annum. Besides the personal chattels mentioned in her will, Mrs. Rieben owned certain moneys and investments in her own right, being the accumulations of her income, and amounting to $53,950. The general legacies in her will amounted to $82,000.

The present action was instituted by the legatees under her will, against Henry W. Hicks as surviving executor of Samuel Hicks, deceased, and the executors of John H. Hicks, deceased, to recover the $50,000 over which Mrs. Rieben had a power of appointment, under her father's will, on the ground that her own will effected a good and valid exercise of that power.

It appeared that Mrs. Riebien's brothers never set apart her $100,000, but that having continued the mercantile business in which they were partners with their father, they absorbed in its operations the whole of her father's estate. The mercantile firm also collected the rents of the house in Broadway. The firm supplied her with funds as required, upon her order, or by remittance on her request. They kept accounts accordingly; and her brother, Henry W. Hicks, from time to time, rendered her accounts, and advised her as to the amount of her estate. He made some investments out of her income, on bonds and mortgages, to the amount of $16,500, but he retained the securities in his personal custody. Mrs. Rieben " never saw any accounts which were kept concerning her father's estate or her own, or had any knowledge concerning such accounts or skill in or acquaintance with accounts." Henry W. Hicks, who is her surviving brother, and the only surviving executor of her father's will, was examined on the trial, as a witness for himself and his co-defendants. His testimony showed that all her money, as well that which was technically her own, as that over which she had the power, remained a common fund in the hands of the mercantile firm; and that whilst all her dealings were nominally with the firm, her brothers, and the survivor of them, managed the whole fund as they or he saw fit. She at all times acquiesced in their action, without inspection or scrutiny.

Parol evidence was adduced, on the trial, to bear upon the question of intention to execute the power, by Mrs. Rieben; as to her bodily condition at the execution of her will; and of extrinsic circumstances relating to herself or her estate. The evidence was objected to, but admitted, by the judge.

And it was agreed that it should be considered as duly excepted to, "so that every part of the same which was not admissible might be stricken out and wholly disregarded."

A judgment was rendered, at a special term, declaring that Mrs. Rieben had duly executed in favor of the plaintiffs a general testamentary power to dispose of $50,000, conferred upon her by the will of her father. From that judgment the residuary legatees appealed.

*Joseph J. Marrin* and *A. W. Bradford,* for the appellant. I. A power is a mere authority by the owner of property, real or personal, to do some act in respect thereto which such owner might himself lawfully perform. If a valid appointment be made under such authority, the donee takes title under the grantor of the power. The exercise of the power by an appointment, whether by deed or will, operates not as a gift of the appointor's own property, but as a gift of the property of the grantor of the power.

II. There must, therefore, be a necessary and manifest distinction between the mode of parting with the grantor's own property, and the mode of disposing of the property of another, under a power. (1.) The former will pass by deed or will purporting simply to convey or devise the owner's property. (2.) The latter will not pass by such an instrument, because it is not the property of the grantee of the power.

III. It is a well settled rule at common law, that a mere general devise or bequest, however unlimited in terms, will not comprehend the subject of the power, but will be attributed or applied to the testator's own estate, and not to the estate of the grantor of the power. There being a distinction between a person's own property and the property of another disposable by a power, "if that distinction exists, it is impossible that the power can be executed by the very words by which property is given." (*Bradly* v. *Westcott,* 13 *Ves.* 444.)

IV. A will disposing of real estate operated at common

law, and also under the statutes 32, 34 and 35 Hen. 8, in the nature of a conveyance, and consequently extended only to hereditaments belonging to the testator when he made the devise. (1 *Jarman,* 43.)   (1.) A will of real estate was, therefore, in the nature of a conveyance or appointment of a particular estate.   (2.) And if at the time of the execution of the will the testator had no real estate, but had a power of appointment over the real estate of another, a general devise was held an appointment, because, to give any effect to the instrument, the intent to execute the power must be inferred.   (3.) But if the testator had any real estate of his own, the intent to execute the power could not be inferred, there being *something* upon which the will could take effect, as the property of the testator. (*Sir Edward Clere's case,* 6 *Coke,* 176.)   "It is well settled, that a general disposition of all the lands of a party, or all his lands in a particular county or place, will not pass lands which the party has merely a power to dispose of, provided, at least, he has other lands to answer to the words." (2 *Chance on Powers,* 84, 92, 98.   *Sugden on Powers,* 385.)   In *Lewis* v. *Llewellyn,* (*Turner & Russ.* 104,) a testator having a power of appointment over certain freehold and copyhold estates, and being seised of other freehold estates, devised all his freehold and copyhold estates without reference to the power. It was held that the power was duly executed as to the copyhold, but not as to the freehold, there being a subject for that branch of the devise.   In *Napier* v. *Napier,* (1 *Simons,* 28,) the testator made a general devise of all his lands in nine parishes; in five of them he had no lands of his own, but there were lands over which he had a power of appointment; in the others he had lands in fee, and there were also lands over which he had a power.   It was held that the estates under the power passed only in those parishes where the testator had no lands of his own.   In *Lovell* v. *Knight,* (3 *Sim.* 273,) the words of the will were: "The whole of my property, both real and personal, and whatever I may

possess at the time of my decease." The vice-chancellor said: "I apprehend it to be perfectly settled, that whenever a will is couched in such terms that, on the face of it, it appears to express an intention to pass the general property which belongs to the party making the will, such a will will not be deemed an execution of the power with regard to any specific property." (2 *Bing.* 497. 10 *Moore,* 113. 5 *Barn. & Cress.* 720. 8 *Dowl. & Ryl.* 514. 6 *Bing.* 475.) In *Rooke* v. *Nowell,* (4 *Bligh,* 151,) the testator owned a moiety of certain land in the county of S. in fee, and the other moiety he held as tenant for life, with power of appointment, and it was held that the part under the power did not pass by a devise of all his freehold estate in the county of S. The will was sustained as a valid execution, in the common pleas; but judgment was reversed in the house of lords, where Lord Tenterden said that it was the better course to abide by general rules and principles, and not to be led aside by subtle distinctions and considerations of hardship in particular cases; otherwise one uncertainty would arise after another, and the end would be inextricable confusion.

V. The statute having changed the rule as to a general devise of real estate, the exceptions to the rule of refusing to look outside of the will, in case of a general devise, would no longer exist. (1.) As the effect of our statute of wills was to alter the common law rule, that all devises are in their nature specific, and to give effect to a general devise over all the real estate owned by a testator at the time of his decease, the rule in respect to a general devise of real estate would be assimilated to the rule in respect to a general bequest of personal estate; for though the testator have no real estate at the time of making the will, he may acquire some, and words of general devise, therefore, have meaning, without resorting to property embraced under a power. (*Sugd. on Pow.* 423.) (2.) The statute as to powers has provided, perhaps for this reason, that "lands embraced in a power to devise shall pass by a will purporting to convey all the real property of the

testator, unless the intent that the will shall not operate as an execution of the power shall appear expressly, or by necessary implication." (1 *R. S.* 737, § 126.) (3.) The statute, however, does not relate to personal estate, which is still left under the dominion of the rules of the common law.

VI. In respect to personalty, the rule has been always strict and undeviating, that you can not look beyond the face of the will for an intent to execute the power. (1.) If the testator have personal property of his own, general bequests must be held to refer to his own property. (2.) If he have no property of his own at the date of the will, yet as future gains will pass, it can not be inferred that he did not intend what he might acquire in future. So the gift of the residue covers all lapses. (3.) In a will of personal estate, a testator is presumed to speak as of the time of his death, and not in reference to any prior or subsequent period. (*Van Vechten* v. *Van Vechten,* 8 *Paige,* 104.) (4.) No ambiguity, therefore, can be raised by the testator making general legacies, which he has not sufficient assets to meet at the time of making the will, and there being no ambiguity, parol evidence can not be given to show an intention not to be found within the will. (*Mann* v. *Mann,* 1 *John. Ch.* 231. *Bunner* v. *Storm,* 1 *Sand. C. R.* 357.) (5.) If parol evidence can be given, the object of the statute requiring wills to be in writing must be defeated. When there is no ambiguity on its face, and none raised on its application, there is nothing to explain by extrinsic proof. (6.) There is no case authorizing the reception, as evidence, of what the testator *said* before or after, or at the time of execution. (7.) The intention to execute the power must be clear. (2 *Chance on Pow.* 92.) "If it be doubtful under all the circumstances, that doubt will prevent it from being deemed an execution of the power." (*Blagge* v. *Miles,* 1 *Story's C. R.* 426.) Slight circumstances of conformity or difference will not amount to a sufficiently clear indication of intention. (*Sugden,* 417, 423. *Bennett* v. *Aburrow,* 8 *Ves.* 609.) As where the husband had power

to devise after the death of his wife, and he made a general disposition to take effect after his wife's death, held no evidence of intention to execute the power. "The instrument being executed in the manner required by the power, goes for nothing." (*Sugden,* 417, 423. 2 *Chance on Pow.* 92.) The mere gift, as an ordinary legacy, of the precise sum which the testator has power to appoint, is not deemed a reference to the power. (*Jones* v. *Tucker,* 2 *Meriv.* 533.) The intent must be so clear that no other reasonable intent can be imputed to the will. (4 *Kent's Com.* 375.) The *terms* must "*demonstrate*" that the testator "had the power in his contemplation," and "intended by his will to execute it." (*Lord Chief Justice Best in Nowell* v. *Roake,* 2 *Bing.* 497, 504.) (8.) Before the act authorizing married women to devise and bequeath real and personal estate, the mere fact of making a will might, perhaps, be some evidence of an intent to execute a power; and yet this circumstance was never held sufficient to disturb the rule. (9.) There are instances where the intent has been inferred, in cases of general devise, but they are characterized by the fact that the testatrix had a right of property of her own in the subject of the power, to which words of general devise could be applied. Thus in *Bradish* v. *Gibbs,* (3 *John. Ch.* 523,) the subject of the power was real estate, belonging to the wife, and settled on her by ante-nuptial contract, with a power of appointment. She made a general will, leaving all her property to her husband, and it was held a due execution of the power. In *Blagge* v. *Mills,* (1 *Story's C. R.* 426,) there was no doubt as to the intent. This case related to real estate, was a general devise, and the testatrix had no land to answer it except that over which she had a power. (*See also Hales* v. *Margerum,* 3 *Ves.* 299.)

VII. Evidence to show that the testator's own estate was insufficient for the purposes of the will can not be received. In *Andrews* v. *Emmot,* (2 *Bro. Ch. Cas.* 297,) the testator having power over £3000, originally the property of his wife,

gave by his will several legacies, and then, after the death of his wife, the residue to the defendant. It was held that the power was not executed, the same not having been referred to nor any thing appearing to indicate an intention to execute it. Evidence to show the testator's own estate was insufficient for the purposes of his will, without the £3000, rejected. In *Hales* v. *Margerum*, (3 *Ves.* 301,) the master of the rolls said : "*Andrews* v. *Emmot* is a leading case, and has perfectly and clearly established, that to execute a power there must be a direct reference to it, or a clear reference to the subject, or something upon the face of the will, or independent of it, some circumstance which shows the testator could not have made that disposition without having intended to comprehend the subject of the power." In *Nannock* v. *Horton*, (7 *Ves.* 391,) a power of appointment of personal property was held not to be executed by a will having no reference to the power or the subject of it. The court refused to inquire into the circumstances of the property, to determine if it were alluded to in the will. The chancellor said : "The case of *Andrews* v. *Emmot*, and the others of that class, are clear, distinct and positive, and express to the point that you are not to inquire into the circumstances of the testator's property at the date of the will, to determine whether he was exercising the power or not." In *Webb* v. *Honner*, (1 *J. & Walk.* 532,) a testator having power to appoint a sum in the funds, made a general will bequeathing all his personal estate, "consisting of money invested in any of the public funds, household furniture," &c. and it was decided not to be an execution of the power, the court saying, "the circumstance of his having no other funded property is not to be adverted to, on the question whether he was or was not executing the power." In *Jones* v. *Tucker*, (2 *Meriv.* 533,) there was a devise of real estate, with direction to sell, and out of the produce to pay £100 to such person as E. S. should appoint. E. S. by will, without reference to the power, gave £100 and her household furniture to the plain-

tiff. It was charged by the bill, and not *denied*, that the testatrix had no personal property at the time of her death, except furniture of small value, and an inquiry was asked as to the state of her property at *the time of making her will*, with the view of showing that she must have intended the gift of £100 as an execution of the power; but the inquiry was *refused*, and the bill dismissed. It was held that there could be "no inquiry as to the *quantum* of personal property, to determine whether a gift is or is not in execution of a power." In *Grant* v. *Lynam*, (4 *Russ.* 296,) the master of the rolls said: "A general gift of moneys, securities for moneys and other personal chattels, which are in their nature subject to constant change and fluctuation, stand upon very different principles from freehold property; and as to them, the will must refer to them as the subjects of the power, or they will not pass." In *Bradly* v. *Westcott*, (13 *Ves.* 444,) the testator authorized his wife to leave by will £500 and other articles. She made a will without any reference to the power, speaking only of "my personal estate," &c. and "all my estate and interest therein." The court held there was no execution of the power.

VIII. Parol proof being inadmissible to prove intention, it is incompetent to show in that way that the testatrix supposed or knew she was *in extremis*. (1.) Where the fact appears on the face of the will, (2 *Chance on Pow.* 97, § 1672,) no parol proof would be necessary; but even then the rule could have no exception without abrogating entirely the grounds upon which it exists. Suppose, for example, a testator having made a will, believing himself *in extremis*, should recover; that fact would not be allowed to change the rule that the will passes all personal property subsequently acquired. Unless the will be signed at the moment of death, there is opportunity for the personal estate to increase. (2.) The testator can not know whether he shall recover or die; his expectation may be defeated by the event; the law can not therefore infer that he knew that he would

have no other personal property. Where the testator has, or supposes he has, property to which the will can apply, the bequest is held to relate to that alone. If he have none, still, as he may acquire in future, there remains a subject for the will. Even if the fact that the will is made *in extremis* may affect the latter rule, it can not the former, for there is property in his belief to meet the will.

IX. If it be said that the will can not be satisfied without embracing the subject of the power, so it may be said, the will can not be satisfied as to the amount of legacies unless it be taken as a general will. If it be a general will, it can not in the same breath be an execution of the power.

X. The failure of the trustees to set apart and invest separately the fund in question could not affect the rule of law as to appointments, nor as to the intent of the testatrix. In whatever form it was placed or existed, the right to dispose of half of it was a mere power given by the will of Samuel Hicks. There should be a decree reversing the judgment at special term, and declaring that the will is not a valid execution of the power.

*B. F. Dunning* and *C. O'Conor*, for the respondents. I. Adopting the principles of § 126 in our statute of 1830 relative to powers, and perhaps improving on its phraseology, the parliament of Great Britain, on July 3, 1837, enacted, in substance that testamentary dispositions of *his* or *her* property made by the donee of a *general* power, such as that possessed by Mrs. Rieben, should be construed to include the property embraced by the power "unless a contrary intention shall appear by the will." (1 *Vict. ch.* 26, § 27.) Independently of this foreign statute, and without claiming, for the present, any aid from our own, the plaintiffs insist that according to the common law, as enunciated in the English judicial decisions, Mrs. Rieben's will should be adjudged a valid and effectual disposition of $50,000 under the power in her father's will. 1. In order to evade restraints upon the

privilege of devising, (1 *Jarman's Powell on Dev.* 5, 6,) and also to facilitate dispositions of the realty *inter vivos, (Sugd. on Pow. 8th ed. ch.* 1, § 1, *subs.* 27, 28,) English conveyancers constructed a very artificial method of procedure by which an absolute *ownership* of real estate, with perfect control and unlimited authority to alienate, was enjoyed under the form of a mere *power.* 2. Though personal estate was of little account in the earlier stages of the English law, and was always transferable by very simple methods, yet its great increase in modern times, the durable character imparted to much of it, as public and corporate stocks, &c. and especially the practice of pledging and charging lands and creating long terms of years for this and other purposes, naturally led to the use of similar forms of settlement both as to realty and personalty. (*Williams on Personal Property, pp.* 1, 2, 7, 31, 234, 186, 195. *Smith on Real and Personal Property,* 159. 4 *Bac. Ab. Leases,* 2.) 3. Such powers became very common in England in modern times, yet so impalpable is the distinction between ownership under the form of a power and the most direct ownership that, even in that country, scarcely any persons except practiced experts in the art of conveyancing, ever realized or perceived the difference. The judicial mind could not retain it without an effort. (*Bradly* v. *Westcott,* 13 *Ves.* 452, 453. *Per Lord Rosslyn in Standen* v. *Standen,* 2 *Ves. jr.* 594; *affirmed in H. of L.* 6 *Bro. P. C., Toml. ed. p.* 193.) *Jickling* (*on Legal and Equitable Estates, ch.* 28, 305,) as well as *Chance on Powers,* § 1678, calls them "powers of ownership," and in § 1675, *Mr. Chance* demonstrates the extreme subtlety of the distinction by showing that powers reserved by an owner on settling an estate, to his own use, stand "according to the general authorities on the same footing" as powers granted to a stranger. Our revisors of 1830, in their notes (3 *R. S.* 589, 2*d ed.*) say: "In reason and good sense there is no distinction between the absolute power of disposition and the absolute ownership." They speak of the dis-

tinction, when applied in matter of substance, as "an affront to common sense." Their § 126 of the article concerning "*powers*" conforms to this view of the subject. 4. A multitude of post-revolutionary and, consequently, non-authoritative English decisions, exhibit a very injudicious effort by some judges to give weight and substance to this thin distinction, by laying down a *rule* that exacted from testators when exercising the "power of ownership," a peculiar style of speech. (1 *Sugd. on Pow. ch.* 6, § 7, *sub–sec.* 19, *Law Lib. ed. Story's Eq. Jur.* 1062, *a.*) It will be asserted that two or three cases decided prior to the revolution are to the same effect. This was an attempt at judicial legislation. Besides, it was repugnant to the principle that wills are informal instruments presumptively made *inops consilii,* to be construed according to the ordinary acceptation of words amongst the inexpert, and requiring no more than that the intent should be manifested with common certainty. The judges themselves did not generally approve the rule or always cheerfully obey it. In 3 *Vesey,* 470, Lord Alvanley, M. R. says: "I rather wish the court had taken another line in these cases, and had held that any general words would be sufficient to execute such powers; but I am not at liberty to say so." In 3 *Myl. & Keene,* 688, Sir John Leach speaks of " the distinction which has been adopted and settled in courts of equity between the power of disposing of property and the technical right of property," as "a distinction which has been regretted by many eminent judges." In 7 *Vesey,* 399, Lord Eldon says, that in acting on this rule the courts had been obliged to defeat the intention "nine times in ten." In *Roake* v. *Denn,* (4 *Bligh's P. C., new series,* 22,) Lord Wynford, speaking of the case before the court, says, nine hundred and ninety-nine out of every thousand would have thought it an exercise of the power. "Unfortunately we are confined by the rules which have been laid down. Rules with respect to *evidence of intention* are bad rules, and I trust I shall live to see them no longer binding on the judges."

More emphatic, if possible, is Vice Chancellor Knight Bruce, on a like occasion, (13 *Jurist Rep.* 384:) "I must, although almost ashamed to say it, decide against what I firmly and sincerely believe to have been the intention of the testatrix, that the power of appointment has not been exercised. I am bound, however, by the authorities; I can not help myself, and I must so decide." Mr. Humphreys, in his "Observations on the actual state of the English laws of real property, with outlines for a systematic reform," (2d ed., *London*, 1827, *p.* 318,) condemning this distinction, recommends that a will, "however it acquired its force, should ever bear the same uniform character. Every needless distinction abolished," adds he, "affords a correspondent clearness of right and protection against litigation." Thus the attempted rule of the modern English cases which is relied upon by the defendants was, by the ablest English judges, and, indeed, on all hands, pronounced a mischievous construction. And at last, (July 3, 1837,) it was, as we have seen, reversed by act of parliament. This was in the same year and a few months prior to the date of Samuel Hicks' will. 5. Whilst it was in its fullest strength, this rule was constantly struggled against and avoided, or evaded on slight grounds of distinction. These very distinctions were always of equal force with the rule itself; and several of them apply to Mrs. Rieben's will, so that even under the English "judge-made law," prior to 1st Victoria, her intent could not have been defeated. We will proceed to call attention to some of these distinctions. 6. If it could be maintained that, by reason of her marriage being *before* the Married Woman's Acts of 1848 and 1849, Mrs. Rieben had not a general testamentary power, but only a right in equity under her father's will to appoint the $50,000, there could be no question in this case. If that were so, the paper called her will could have no effect as a will; and, according to the strictest of the English decisions, it would, for that very reason, be deemed an appointment of this $50,000. (*Standen* v. *Standen,* 2 *Ves. jr.*

594. *Bradish* v. *Gibbs,* 3 *John. Ch.* 523. *Sugd. on Pow ch.* 6, § 7, *subs.* 1 *and onward, Law Lib. ed. Best, Ch. J. citing and explaining Sir Edward Clere's case, in Doe* v. *Roake,* 2 *Bingh.* 505, 506, 9 *Com. Law Rep.* 500. *Mr. Sugden (Lord St. Leonards) on Lovell* v. *Knight,* 1 *Sugd. on Pow.* 424, *ch.* 6, § 7, *sub.* 55, *Law Lib. ed. Id.* 436, *ch.* 6, § 8, *sub.* 10, *citing Roscommon* v. *Fowke, Law Lib. ed. Churchill* v. *Dibben, by Lord Hardwicke,* 2 *Ld. Kenyon's Rep. part* 2, *pp.* 78, 82. *Curteis* v. *Kenrick,* 9 *Simons,* 443–446. *S. C.* 3 *Mees. & Welsb.* 467, *per Park, B.*) 7. Under the English rule it was always held that if, in any way, the judges could discover in the instrument relied upon as an execution of the power, an intention to give the property in question, that would suffice. So, if a testator having no real estate other than that embraced by a power, devised in terms *his real estate,* that was deemed a sufficient execution of the power. (*Wigram's Extrinsic Ev. 4th ed.* § 26.) If, in any way, a testator indicated that he considered any one thing which was only subject to his *power* to be adequately described by such words as *my* land, *my* property or *my* estate, then it was adjudged that such words, used by him in a general residuary devise or bequest or otherwise in the same will, would extend to *all* real or personal property over which he had merely a *power.* (*Dillon* v. *Dillon,* 1 *Ball & Beatty,* 77; *commented on in Sugd. on Pow. 8th ed. ch.* 7, § 7, *subs.* 96, 109, 111. *See* 1 *Story,* 453.) If he said "I give whatever I have any power to give," or the like, instead of using the possessive "*my,*" then the difficulty was held to be obviated. (*Sugd. on Pow. 8th ed. ch.* 7, § 7, *sub.* 35.) 8. Mrs. Rieben's will was made when she was *in extremis* and in expectation of immediate death. This fact shows that she could not have contemplated *future* acquisitions. Her intent could only be to give what she had control over at the moment of making her will. This circumstance brings her will within the principle of a *specific* disposition, thereby indicating her intent to give the very thing which

was the subject of the power. According to the strictest of the modern English decisions this is sufficient. Though testimony of *words* not in the will is never to be admitted on a question of intent, (2 *Ball & Beatty,* 48; *Wigram's Extrinsic Evidence, 4th ed.* § 104,) there can be no objection to proof of *this fact.* Indeed, such a fact as that a party is *in extremis,* and contemplates death as inevitable, has been admitted to determine the most solemn cases. (*Vass' case,* 3 *Leigh,* 793. *Cowen & Hill's ed. of Phil. Ev. vol.* 1, 235, *note* 453. *Dunlop* v. *Dunlop,* 4 *Dess.* 320. *Wigram's Extrinsic Ev., proposition 5th, p.* 65, *4th ed.; and see* §§ 69, 71, 74, *&c. Guy* v. *Sharpe,* 1 *Myl. & Keene,* 603. *Doe* v. *Beynon,* 12 *Ad. & Ellis,* 436.) Under the Scotch law, the validity of some dispositions of property depend entirely upon the fact whether or not they are made "by a person on death-bed." (*Miller* v. *Marsh,* 2 *McQueen's H. of Lords Cases,* 285. *Crawford* v. *Coutts,* 2 *Bligh,* 660.) So as to the nuncupative will of English and American law. (*Prince* v. *Hazelton,* 20 *John.* 514. *Williams on Personal Prop.* 235, 236.) "Every claimant under a will has a right to require that a court of construction, in the execution of its office, shall place itself in the situation of the testator, the meaning of whose language it is called upon to declare. It follows that if, with the light which that situation affords, the testator's meaning can be determined by a court, the court which so determines does, in effect, declare that the testator *has expressed* his intention with certainty." *Wigram's Extrin. Ev. 4th ed.* § 96, *and cases in notes. Smith on Real and Personal Prop.* 776. *Wolfe* v. *Van Nostrand,* 2 *Comst.* 440.) Thus placing itself by means of the extrinsic evidence "in the situation of the testatrix," when her will was made, the court is enabled to see clearly that, as she could not have contemplated *future* acquisitions, and as her other assets were wholly insufficient to satisfy her bequests, she must have intended to execute her power. There are several post-revolutionary English determinations against admit-

ting, in this class of cases, evidence that the testator's own proper personal assets were insufficient, or that he had none. But these determinations do not go upon the ground that such evidence is in its nature incompetent. They rest upon a reason which is quite just, but which is inapplicable to the case of a testament made *in extremis*. None of the English cases presented that feature, except *Lownds* v. *Lownds*, (1 *Y. & Jervis,* 447.) In that case the power was held to have been executed. Under the old law, no lands could pass by will except those held at the date of the will; consequently every devise was deemed to be specific, and every devisor was understood as having in view the existing state of things only, and as intending to give only the particular lands *then* under his control; whereas a general bequest has always been held to include whatever personalty the testator might have at that future period when his death should happen. For this reason, evidence of the want of real assets was received, but evidence of the state of personal assets was rejected as inconclusive. It would throw no light upon the question of intent. (*Innes* v. *Sayre,* 7 *Hare,* 381. *Dummer* v. *Pitcher,* 2 *Myl. & K.* 277. *Jones* v. *Tucker,* 2 *Merivale,* 537. *Lake* v. *Currie,* 13 *Eng. Law and Eq.* 489. 2 *De Gex, McN. & Gordon,* 547. *Wigram's Extrin. Ev.* 4th ed. §§ 26, 27, 103, 104. *Nannock* v. *Horton,* 7 *Ves.* 399. *Webb* v. *Honnor,* 1 *Jac. & Walk.* 357. *Mattingly's Trusts,* 2 *John. & Hem.* 426. *Gorden* v. *Dotterill,* 1 *Myl. & K.* 57, 58.) On this latter point, however, the English cases are somewhat conflicting. (*Jones* v. *Jones,* 13 *Irish Ch. R.* 409. *Sugd. on Pow.* 8th ed. ch. 7, § 7, *subs.* 62, 64, 65.) The fact that the will was made *in extremis* takes this case entirely out of this reasoning, and renders it proper to look into the state of the testatrix's assets. 9. Apart from the mere insufficiency of the assets, the very peculiar wording of Mrs. Rieben's will affords a ground for calling in aid "the situation of the testatrix." And the very *words* of the will, when read in the light of that situation, plainly

White *v.* Hicks.

manifest an intention to execute the power. Very slight circumstances have been laid hold of by such eminent jurists as Lord Redesdale, Sir William Grant and Sir James Mansfield to support the intent in this class of cases. (*Bradly* v. *Westcott,* 13 *Ves.* 453. *Wright* v. *Cadogan,* 2 *Eden,* 258.) The whole scope of the will shows that, by the phrase "the remainder," the testatrix refers to something else than the general residue of her own estate. It is "the remainder" of some particular fund or property which she had in view, and which fund or property, as is often the case, can not be ascertained from the will itself. Hence there is an ambiguity as to *the subject of the gifts.* This circumstance alone lets in extrinsic evidence to *identify* the subjects. (*Wig. Extr. Ev. 4th ed.* § 103. *Fonnereau* v. *Poyntz,* 1 *Bro. C. C.* 480, *and notes to Perkins' ed. Druce* v. *Dennison,* 6 *Ves.* 401–404. *Innes* v. *Sayre,* 7 *Hare,* 383.) The extrinsic evidence does not contradict any description of the fund found in the will. It harmonizes perfectly therewith. (2 *Brod. & Bing.* 553.) On looking into her situation, we find that, both in form and in substance, the brothers had wholly disregarded the rules of law and equity, as well as the plain and positive injunctions of her father's will concerning the investment and management of her estate. The whole $50,000 left to her disposal by her father, together with all savings from the income of this and her other property left by him to her use, constituted one undistinguishable and indivisible mass in the hands of the same person or persons. Can there be any doubt that she meant "*the* remainder" of that mass or fund regarded as an entirety? (*Innes* v. *Sayre,* 7 *Hare,* 382, 383. 3 *McN. & Gordon,* 613. *Sugd. on Pow. 8th ed. ch.* 7, § 7, *sub-sec.* 67. *Amory* v. *Meredith,* 7 *Allen's Mass. Rep.* 401.) V. C. Wigram in 7 *Hare,* 382, and Denio, J. in 3 *Kern.* 104, show that bequests in reference to a question of intent may be regarded as "in some sense specific," though they could not be so deemed for all the general purposes for which that distinction is established. She used her father's will as a guide or

precedent in selecting her husband to be recipient of *the* $50,000; and she reverted to *the* $50,000, intended for the husband after she had disposed of her own property. These are two strong indications of her intent. The whole of these circumstances taken together prove the pecuniary legacies to be a *specific* disposition of this entire fund. (*Loring* v. *Woodward*, 41 *N. H. Rep.* 394. *Lake* v. *Currie*, 13 *Eng. Law and Eq.* 489.) When it is considered that by their method of keeping the property, and their whole course of dealing with it, the brothers *taught* this lady to regard the fund in this way, a court of justice "should pause very much before setting aside," at their instance and for their benefit, her disposition framed in that very view of it. (*Griffin* v. *Nanson*, 4 *Ves.* 356.) 10. The $50,000 fund, so carefully guarded by the father as to be entirely exempted from any discretionary control on the brothers' part, had no actual existence when her will was made. In its place there was merely a chose in action. She had a right to compel them to place such a sum at her disposal. *This* right was her own property. It would be a great perversion of justice if *they* could be permitted to defeat her will by an imported cavil founded on her omission to observe a distinction which, throughout her life, they had themselves so completely disregarded, thus inducing her to overlook it. 11. In the English cases a great deal of difficulty has grown out of the decedent's use of the word "*my*" in reference to the property intended to be given. This was thought to indicate affirmatively an intent to give only that in which the party had, in the strict technical sense, an interest or property. The testatrix in this case, when speaking of the money intended to be given, wholly omits that word or any equivalent, but she applies it to her chattels in possession. The use of the word in the latter case gives pointed emphasis to the omission of it in the former. Viewed in the light thrown upon it by this contrast, (*Maples* v. *Brown*, 2 *Simons*, 327,) the omission is quite equivalent to the expression "by any power I may

have." Under the English cases this idea, if written in the will, or fairly to be implied from its provisions, (2 *Eden*, 258,) is fully sufficient to rescue the intent. Decisions on the effect of the word "my:" 13 *Ves.* 452, 454; 1 *Swanst.* 73; 3 *Ves.* 470; 3 *Simons*, 279; 7 *Ves.* 400; *Wigram's Extrin. Ev.* §§ 26, 27, *4th* ed. "The absence of that expression [my] makes this a much stronger case in favor of the execution of the power." (*Per Romilly, M. R., Banks* v. *Banks*, 17 *Beavan*, 354.) 12. If this case had arisen in England prior to 1 *Vic.* its special circumstances would have turned aside the poisoned shaft aimed at the intent. Any English judge would have said of it, as Lord Northington expressed himself in 2 *Eden*, 258 : "Contrary to the illiberality which prevailed in ancient times, when with subtilty, narrow reasoning and technical prejudice, they required the nicest exactness and scrupulous forms in carrying people's intention into execution, * * a number of cases have now said that where the intention was to pass at all, the judges are *astuti* to find it sufficient." And "it is a very wise principle."

II. We have shown the origin, the life and the death of the pernicious foreign dogma on which the defendants rely. It was not firmly established whilst English parliaments or English judges had authority to make law for us ; and it has "never yet been followed in this country." (1 *Kern.* 49. 8 *Peters*, 660.) Of post-revolutionary creation, its feeble and contentious life had terminated even before the date of Samuel Hicks' will. Under these circumstances, the benign principles of decision in the interpretation of wills which have been uniformly observed in America forbid its introduction to defeat the manifest intent, through mere deference to English decisions which were never authoritative *here*, and are now obsolete at home. (*Peter* v. *Beverly*, 10 *Peters*, 564. 1 *Washington's Va. Rep.* 271, 272. *King* v. *Ackerman*, 2 *Black's U. S. Rep.* 413.) 1. After its extinction by act of parliament, it can not be permitted, like the vampyre of eastern fable, to arise from its grave, cross the wide Atlan-

tic and here exercise the privilege of working injustice which is no longer accorded to it in the land of its birth. (*King* v. *Ackerman, Id.* 564.) 2. There are in the English books but two cases decided prior to the revolution which are ever referred to as precedents for this rule. (6 *Co.* 18. 1 *Atk.* 559.) Those two cases relate to real estate, and they do not sustain the post-revolutionary decisions. The latter are not themselves authority in this country. 3. Powers in trust, that is to say, powers to executors and other fiduciaries to make dispositions of property for some specified purpose, as to pay debts or legacies, or for facility of distribution among children or next of kin, &c. have been extensively used in this country, and have given rise to considerable forensic discussion. But, until a very recent period at least, the *power of ownership* so common in English practice was scarcely known in America. Though "in England found in almost every conveyance," the revisors of 1830 say that "powers are almost unknown in this state." (3 *R. S. 2d ed.* 592.) Hence, no doubt, the lack of fuller or *more verbose* provision in their work for obviating doubt in cases like the present. Their statement was true. *Bradish* v. *Gibbs* (3 *John. Ch.* 523) is the only case of such a power in the New York reports, prior to that date. The first edition of Story's Equity Jurisprudence, published in 1836, contained no statement of the modern English judicial puzzle on this subject. It first appeared in a subsequent edition. (§ 1062, *a.*) The copious and masterly collection of American decisions, called the "United States Digest," first acknowledged their existence as a class in 1852. (*See Annual Dig. for* 1852, *vol.* 6, *tit. Devise and Legacy, I, e.*) 4. When cases belonging to this class of powers did arise in this country, the modern English doctrine was not approved or followed. (*Blagge* v. *Miles,* 1 *Story's Rep.* 445 to 450   *Andrews* v. *Brumfield,* 32 *Miss. R.* [3 *George*] 115 to 118.   *Crane* v. *Morris' lessee,* 6 *Peters,* 619, 620. *Amory* v. *Meredith,* 7 *Allen's Mass. R.* 397, 400.) The American rule is, that "To the due execution of a power, a

White *v.* Hicks.

recital of it, or even an express reference to it, is not necessary. The intent to execute it is matter *in pais*, to be collected from all the circumstances." (*Curtis' U. S. Digest*, 379. *Crane* v. *Lessee of Morris*, 6 *Peters*, 620. *Carver* v. *Jackson*, 4 *id.* 98, 99.) Mr. Justice Story, in a note to his son's reports, (*vol.* 1, *p.* 458,) thus refers to the statute of 1st Vict.: "The doctrine, therefore, has settled down, in that country, to what seems to be the dictate of common sense, unaffected by technical niceties."

III. If the distinction between *interest* and the absolute *power of disposition* ever had a place in the law of this state relative to the exposition of wills, the statute of 1830 concerning powers entirely abrogated it. (1 *R. S. 1st ed.* 737, § 126.)  1. Although this section speaks only of "lands," it establishes a rule of construction which should also be applied to personal estate. (*Van Wert* v. *Benedict*, 1 *Bradf.* 123.) 2. Title to real and personal estate, so far as it depends upon rules of judicial exposition, should be governed by the same principles; and it would be a reproach to the law if the same words should be judicially expounded as indicating a different substantive intent when applied to personal property, from their judicial acceptation when applied to the realty. The judges have uniformly established a substantial analogy of interpretation and effect for the same words of grant, notwithstanding technical or formal differences in the kind of property or of interest intended to be conveyed. (*Patterson* v. *Ellis*, 11 *Wend.* 300, 301, 266. *Preface to Jickling's Analogy between legal and equitable estates.*) The legislature has indicated a like policy. (1 *R. S. 1st ed.* 773, *title* 4, *and especially* § 2. 2 *R. S.* 57, § 5. *Id.* 63, § 40.) 3. The distinction between ownership in other forms and ownership under the form of a general power, was originally introduced from the law of powers over the realty, and applied to personal property by analogy. It would be very singular if the shadow were to continue after the substance had passed away. *Cessat ratio cessat et ipsa lex.* When

framing their code, the revisors of 1830 seem to have been altogether oblivious to the notion that the *power of owner-ship* might be applied to personal property. (1 *R. S. 1st ed.* 732, § 74.) They were quite justified in ignoring it. That power had, in respect to personal property, no practical exist-ence in this country. When they recognized *powers,* as a means of exercising dominion over property, and affirmed that they applied to real property only, the distinctive char-acter given to such powers over personalty by English judges was, by a necessary implication, virtually annulled. Thence-forth they stood on the same precise footing as all other prop-erty belonging to the grantee or reservee.

In any view that can be taken of this case, the judgment is right; and it should be affirmed, with costs.

SUTHERLAND, J. The question in this case is: Did Mrs. Rieben, by her will, exercise, or execute, the general power of appointment, given to her by the will of her father, over $50,000 of the $100,000 which he directed to be kept invested for her use, during her life?

If the question were a question of intention, on the will of Mrs. Rieben, and *the evidence in the case,* there could not be a doubt that her will should be deemed a due execution of the power, and that the judgment of the special term should be affirmed. But the question in the case really is, as to the admissibility of certain evidence, to show that she intended by her will to execute the power.

As to all the evidence as to what the testatrix said, at or about the time she executed her will, it is not claimed by the counsel for the plaintiffs that it was admissible, in any view of the case; and it clearly was not; for as to what she said, the will alone can speak. No words of the testatrix, except those in the will, could properly be proved.

If the question in the case was as to the interpretation of the will *as a will disposing of the testatrix's own property, only,* there would not be any question in the case; for then

White *v.* Hicks.

there could not be a doubt that all the evidence to show the situation of the testatrix at the time she made her will; that she made it *in extremis;* and all the evidence relating to the property or fund disposed of, or claimed to have been disposed of, would have been admissible.

It is a general rule of evidence, that for the purpose of construing and giving effect to the intended operation or effect of a written contract, the situation of the parties, and the situation or condition of the subject of the contract, at the time, and generally the circumstances under which the contract was made may be shown; not for the purpose of showing what the parties intended to say in the contract, but for the purpose of ascertaining the meaning of what they have said in the contract; not for the purpose of showing the intention intended to be expressed in the contract, but for the purpose of showing the expressed intention. This rule of evidence applies, with all its force, and to its full extent, in the interpretation of a will operating, or intended to operate, *as a will simply,* and not as the execution of a power. (*Wigram's Extrinsic Ev. proposition 5, p. 65, 4th ed.*)

I have examined many of the cases referred to by the counsel, in the principal case, and many others, as to the law in England relating to the execution of powers by wills when the act 1 *Vict. ch.* 26, effecting so great a change, was passed; and my conclusions on that point, so far as it has been discussed by the counsel, and so far as it may be of any importance in this case, are as follows: 1st. If the party, claimed to have executed a power by will, had no power to make a will—that is, had no general testamentary power—if she was a married woman, for instance—that the will, or instrument so called, might be deemed an execution of the power, though it did not refer to *the* power, or to any power generally; and though the subject of the power was not mentioned or referred to in it. (*See Shelford* v. *Acland,* 23 *Beav.* 10.) But as to this point there is considerable doubt. (*See Lovell* v. *Knight,* 3 *Simons,* 275; *Lempriere* v. *Valpy,* 5 *id.*

108.)   In many of the cases cited by the counsel for the plaintiff, on this point, the subject of the power was real estate, and there was a general devise, and these cases do not apply.

2d.  The language of the whole will, taken together, might give the will the effect of an appointment under the power. It was sufficient if it appeared, in any way, on the *face of the will*, that the testator did not consider himself as disposing of his own property, but as executing a power. (*Hawkins on the construction of Wills, p.* 24; *Hunloke* v. *Gill,* 1 *R. & My.* 515, there cited.   *Churchill* v. *Dibbin,* 2 *Lord · Kenyon's Rep. part* 2, *p.* 69.   *Dillon* v. *Dillon,* 1 *Ball & B.* 77.   *Doe* v. *Roake,* 2 *Bing.* 497.)

3d.  The will might be deemed an execution of the power, without referring to the power, or any power, if the subject of the power was mentioned or referred to.

4th.  If the subject of the power was lands, or lands in a certain county, a general devise of all the testator's real estate, or all his real estate in that county, was deemed an execution of the power, if the testator had no real estate of his own, or no real estate of his own in the county, though the will did not refer to the power, or in any other way to the subject of the power; and though there was nothing on the face of the will to show that the testator did not consider himself as disposing of his own real estate. (*Standen* v. *Standen,* 2 *Ves. jun.* 589.   *Denn* v. *Roake,* 6 *Bing.* 475.)

5th.  But if the subject of the power was personal property, the rule was that you could not look beyond the face of the will for an intent to execute the power. (*Molton* v. *Hutchinson,* 1 *Atk.* 558.   *Andrews* v. *Emmet,* 2 *Brown's Ch.* 297. *Nannock* v. *Horton,* 7 *Ves.* 391.   *Sayer* v. *Sayer, Innes* v. *Sayer,* 7 *Hare,* 27 *Eng. Ch.* 376.   *Sibley* v. *Perry,* 7 *Ves.* 523.   *Grant* v. *Lyman,* 4 *Russ.* 296.   *Webb* v. *Honner,* 1 *J. & Walk.* 532.   *Jones* v. *Tucker,* 2 *Meriv.* 533.   *Bradly* v. *Westcott,* 13 *Ves.* 444.)

The truth is, these English cases, only a few of which have

been referred to, did not put the execution of a power by a will on the ground or question of intention.   By force of precedent, (and it may be said by the conservative force of precedent,) they settled and established a technical rule that a will to execute a power must have certain features on *its face*, irrespective of the intention.   It was conceded, in many of the cases, that the operation of the rule was to defeat the intention; and hence the act of parliament.   Mr. Sugden thus states the rule: "Before the statute (1 *Vict. ch.* 26) it was firmly settled, that a mere general devise or bequest, however unlimited in terms, would not comprehend the subject of a power, unless it referred to the subject, or to the power itself, or generally to any power vested in the testator." (*Sugd. on Pow.* 8th ed. 301, § 35.)   Again he says, that before the statute the rule was universal, that where "the power was not referred to, the property comprised in it must be mentioned, so as to manifest that the disposition was intended to operate over it; the donee must do such an act as shows that he had in view the thing of which he had a power to dispose." (*Id.* 300, §§ 31, 32.)   It is plain that this rule involved the exclusion of all evidence of extrinsic facts to show intention, when a will by which a power was claimed to have been executed did not, on its face, come within the rule.   What was the use of receiving such evidence, if the will, on its face, was not within the rule?

It is of no importance, in this case, whether the rule before mentioned, that a general devise, where the subject of the power was real estate, might carry the subject of the power, when the testator had no real estate of his own, was, or was considered to be, a qualification of, or an exception to, the settled rule as stated by Mr. Sugden.   But to show the shadowy distinctions to which this qualification of, or exception to, the general rule lead, compare *Jones* v. *Curry*, (1 *Swanst.* 66,) with *Standen* v. *Standen*, (2 *Ves. jun.* 589.)

The most difficult cases to reconcile are the cases where the question was, whether the subject of the power was referred

to or mentioned in the will, within the rule. Compare *Innes* v. *Sayer*, (3 *Man. & G.* 606, and 7 *Hare*,) *Lownds* v. *Lownds*, (1 *Y. & J.* 445,) and *Walker* v. *Mackie*, (4 *Russ.* 76,) with *Nannock* v. *Horton*, (7 *Ves.* 391,) and *Jones* v. *Tucker*, (2 *Meriv.* 533.)

If the property subject to the power was so mentioned or described in the will, or by the bequest, as to make the bequest *specific*, then the will might be held to execute the power, and then evidence of extrinsic facts as to the circumstances of the testator's property might be received, to show *that the property so mentioned or described in the will, or specific bequest, was the subject of the power.* (*See cases last cited, and Innes* v. *Sayer,* 7 *Hare, and* 3 *Man. & G. before cited.*)

So far as our decision of the question of evidence, in the principal case, can or ought to be controlled, or influenced, by the English rule or cases, it is sufficient to say, that it appears to have been perfectly settled, when the act 1 Vict. was passed, that when the subject of a general power of appointment was personal property, evidence of the state or circumstances of the testator's personal property was not admissible, nor indeed of any extrinsic fact or circumstance to show that he intended by a general bequest to exercise his power of appointment.

Now I think Mrs. Rieben had a general testamentary power, notwithstanding her coverture, under the married woman's act of 1848, as amended in 1849; and if she had, as the will does not refer to any power, and as there is nothing on the face of the will to indicate that she did not consider herself as disposing of her own property, it is plain that, by the English cases and the English rule, the will was not an execution of the power, and could not be shown by evidence of any extrinsic fact or facts to have been intended to be an execution of the power, unless it can be said to mention or refer to some *specific* fund or property, out of which she intended the legacies to be paid. Though there are features

of the will which render it probable that the testatrix, in wording it, had in view a particular *amount* of property or money, I do not think it can be said that the will *mentions*, or *refers to*, any *specific* fund or property.

If, then, the question of evidence, presented by the appeal, is to be decided by the English cases, and the English rule, we must reverse the judgment of the special term, and declare that not any of the evidence as to extrinsic facts was properly received.

If the will had referred, in any way, to the $100,000 of which Mrs. Rieben had the use for life, possibly that might have been sufficient to let in evidence of extrinsic facts. But considering that *Molton* v. *Hutchinson*, (1 *Atk.* 558,) is the only English case, prior to the commencement of our revolution, (*Const. of N. Y., art.* 1, § 17,) referred to, that is strictly in point, (that being the case of a general bequest;) that the English rule as to general bequests, and in certain other respects, has been abolished by statute; that the reason for the distinction between a general devise, and a general bequest executing a power, no longer exists: considering the American cases, *Blagge* v. *Miles*, (1 *Story's Rep.* 445 to 450,) and the late case of *Amory* v. *Meredith*, (7 *Allen's Mass. Rep.* 397;) and considering that it is not and never has been reasonable, that the will of a party having a general and absolute power to dispose of property should be defeated, because he treated the property, by the will, as his own; I am of the opinion that the evidence as to the circumstances or condition of the property or fund in the hands of Mrs. Rieben's brothers; the evidence to show that her own savings or property was not sufficient to answer the special legacies; and indeed, that all the evidence of extrinsic facts, as distinguished from what the testatrix said, was properly received; and that the judgment of the special term should be affirmed, with costs to the respondents, to be paid by Henry W. Hicks.

I do not see that the provision, 1 *Rev. Stat.* 737, § 126, or

Rieben *v.* White.

the enactment of that provision, has any weight as an argument, on either side of the question.

LEONARD, J.  I am satisfied with the conclusion that the will should be held to be a valid execution of the power.

GEO. G. BARNARD, J. also concurred.

Judgment affirmed.

[NEW YORK GENERAL TERM, November 7, 1864.  *Leonard, Geo. G. Barnard* and *Sutherland,* Justices.]